O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel BRIAN HASTINGS,<br><br>                    Plaintiff,<br><br>        v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION (INC.), individually as s/b/m with WELLS FARGO HOME MORTGAGE, INC.; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOANS SERVICING, LP n/k/a BAC HOME LOANS SERVICING, LP; et al.,<br><br>                    Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV 12-03624 DDP (SSx)<br><br>**ORDER GRANTING JOINT MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>[**DOCKET NUMBER 72**] |

Before the court is Defendants' Joint Motion to Dismiss Plaintiff Brian Hastings' First Amended Complaint. (Dkt. No. 72.) The motion is fully briefed. Having considered the parties' submissions and heard oral argument, the court adopts the following order.

**I.    Background**

Plaintiff-relator Brian Hastings ("Plaintiff") is a real estate agent who seeks to bring this action on behalf of the United

States for alleged violations of the False Claims Act, 31 U.S.C. §§ 3729 et seq. Defendants are lending institutions that have been approved by the Federal Housing Administration ("FHA"). Plaintiff's First Amended Complaint ("FAC") alleges that Defendants have made false claims to the government in relation to federal mortgage insurance policies issued pursuant to the National Housing Act ("NHA"), 12 U.S.C. § 1709(a). The United States has declined to intervene to prosecute the claim. (Dkt. No. 18.)

The FHA, part of the Department of Housing and Urban Development ("HUD"), is authorized to provide mortgage insurance for single-family home loans to help low and moderate income families purchase a home. See 12 U.S.C. § 1709(a). The FHA does this by providing mortgage insurance on single-family home mortgage loans originated by FHA-approved lenders under prescribed terms. Id. To obtain an insurance certificate, an FHA-approved lender must certify that the mortgage is compliant with applicable statutes and HUD regulations. See 12 U.S.C. § 1715Z-21(e); 24 CFR § 203.5(a)-(c). Once an insurance certificate is issued, if a borrower subsequently defaults on its payment obligation under the mortgage, the FHA-approved lender may submit a claim for insurance benefits to HUD.

**A.   Plaintiff's First Amended Complaint**

Plaintiff's FAC alleges that Defendants have submitted claims for insurance benefits to HUD based on false certifications of compliance with a provision of the NHA that, during the relevant period, mandated that borrowers made at least a 3 percent down payment on the property before a mortgage may be issued. See 12

U.S.C. § 1709(b)(9) ("[T]he mortgagor shall have paid on account of the property ... at least 3 per centum").[1]

Under HUD's rules and regulations, the required 3 percent down payment may be made through the use of a gift from certain designated sources, including charitable organizations. See HUD Handbook 4155.1, Revision 4, Change 1, Paragraph 2-10(C) ("HUD Handbook 4155.1"). Importantly for this action, however, "[n]o repayment of the gift may be expected or implied." Id. Since 2000, HUD has had a policy that "[m]ortgage lenders are responsible for assuring that the gift to the home buyer from the charitable organization meets the instructions described in HUD Handbook 4155.1, Rev. 4, Change 1 (e.g. no repayment implied, etc.)." HUD Mortgagee Letter 00-8 (Mar. 3, 2000) at 4-5 (FAC Ex. C). Specifically, the lender must document the transfer of the funds from the donor to the borrower, including placing a gift letter signed by the donor and borrower in the loan file submitted to FHA specifying the dollar amount and stating that no repayment is required. See HUD Handbook 4155.1.

The gravamen of Plaintiff's FAC is that Defendants have falsely certified compliance with the 3 percent down payment requirement by endorsing loans made possible through down payment assistance gift programs ("DAPs") which Plaintiff alleges circumvented the 3 percent requirement. (See FAC ¶¶ 63-84.) Under the DAP model, which was pioneered by a non-profit charity organization called the Nehemiah Corporation of America

---

[1] In 2008, the requirement was modified to 3.5 percent. See Housing and Economy Recovery Act of 2008, Public Law 110-289 Section 2113 (July 30, 2008).

("Nehemiah"), the charity provides the borrower with funds to pay the down payment. After the loan closes, the lender then pays the charity a service fee or contribution that is equivalent to or exceeds the amount given to the borrower by the charity. Plaintiff alleges that, under these programs, the sales price of the home is increased to account for the contribution the seller makes to the charity to reimburse the charity's gift to the borrower. The borrower thus ultimately ends up paying the down payment over the course of the mortgage, making the charity's contribution to the borrower a "false gift." (See, e.g., FAC ¶¶ 65-66, 75, 85.) Plaintiff contends that this "sales price manipulation" renders fraudulent the gift letters submitted by Defendants to obtain insurance from FHA for the loans it has endorsed. (Id.)

Plaintiff makes various allegations to show that Defendants were aware that sellers increased prices to finance DAPs. Plaintiff alleges that the Nehemiah Program was explicitly presented to mortgage lenders and real estate agents as designed to ensure that the seller can "net the same amount" of money as it would have received had the seller sold the home to an FHA-financed buyer who did not need down payment assistance by shifting the cost of participation in the program to the buyer through a higher sales price. (Id. ¶¶ 65, 73.) Nehemiah's "Standard Program Guidelines" from July 2000 explicitly contemplated how the program can be used to "assist [the real estate agent] in obtaining a full price offer on the home that can offset the costs of participating." (Id. ¶ 68.) Plaintiff also cites the internal underwriting guidelines of various Defendants which he contends show that they were aware that Nehemiah-style programs do not provide true gifts for which

1  repayment is not required. (See id. ¶¶ 119-187.) Plaintiff points,

2  for example, to a Suntrust underwriting guidance document dated

3  August 29, 2005 noting that Nehemiah-style "seller funded non-

4  profit down payment assistance programs" "should not be confused

5  with other non-profit housing agencies that provide true gifts or

6  secondary financing to eligible borrowers." (See id. ¶ 121 and Ex.

7  K1.) Additionally, Plaintiff included as exhibits to his FAC a set

8  of real estate postings from August 1999 with comments from brokers

9  appearing to indicate that a higher sales price would apply in the

10  case of funding from a DAP. (See FAC Ex. U). The listings were

11  culled from a Multiple Listing Service ("MLS"), a mass database of

12  mortgage listings used by brokers. (FAC ¶ 10, 279.)

13      In relation to these allegations, Plaintiff asserts that

14  Defendants engaged in, *inter alia*, the following fraudulent

15  conduct:

16  •   Defendants knowingly presented fraudulently obtained mortgage
        insurance certificates and fraudulent claims to HUD to claim
17      and secure cash mortgage insurance benefits for noncompliant
        mortgages. (Id. ¶¶ 104-17.)
18

19  •   Defendants knowingly presented fraudulent claims that violated
        HUD's regulation requiring compliance with the Federal Truth
        in Lending Act, 15 U.S.C. §§ 1601 et seq., which provides that
20      all finance charges levied directly or indirectly on the buyer
        must be disclosed to the buyer. (Id. ¶¶ 298-302.)
21

22  •   Defendants prohibited gifts from Nehemiah-type programs with
        conventional loans while allowing their use with FHA loans,
        which amounted to "misrepresentative advertising" in violation
23      of HUD Handbook 4060.1, Paragraph 2-17.  (Id. ¶¶ 328-30.)

24  •   Defendants knowingly violated HUD regulations, 24 CFR §
        203.5(c) and HUD Handbook 4000.4, Paragraph 2-5, which require
25      an FHA-approved lender to exercise the same level of care in
        originating an FHA-insured loan as it would in originating a
26      loan in which the lender would be entirely dependent on
        property as security to protect its investment. (Id. ¶¶ 30,
27      120-22, 411.)

28

1    •    Defendants knowingly violated HUD's requirement of compliance
2         with state consumer protection laws, including Cal. Bus. &
          Prof. Code §§ 17537 et seq., by falsely using the term "gift"
          in representations to the public despite expecting repayment
3         of that "gift."  (Id. ¶¶ 306-30.)

4         Plaintiff attached as appendices to his FAC lists of

5    foreclosure conveyance claims to HUD for dozens of mortgages

6    originated in 2007 and 2008 utilizing Nehemiah or Nehemiah-like

7    DAPs where the borrower ultimately defaulted. (FAC Apps. B & C.)

8    Plaintiff contends that these are representative of 35,201

9    fraudulent claims for insurance benefits by Defendants since May

10   20, 2009. (See FAC ¶ 364.) The contention that these claims are

11   false appears to rest on the assumption that any mortgage

12   originated with a Nehemiah-style DAP involved a "false gift" which

13   the buyer was required to repay through higher mortgage payments,

14   and thus the lender's certification of compliance with HUD

15   regulations, including the Handbook 4155.1's prohibition on gifts

16   that must be repaid, was fraudulent.

17        Based on the above allegations, Plaintiff's qui tam action

18   asserts sixteen False Claims Act claims, each against all

19   Defendants, on behalf of the United States. (Id. ¶¶ 383-438.) He

20   alleges approximate damages of $7.48 billion plus civil penalties.

21   (Id. ¶¶ 365-74.)

22

23   **B.   Judicially Noticeable Facts Cited by Defendants**

24        The utility and legal status of Nehemiah and Nehemiah-like

25   programs have been the subject of considerable debate within the

26   government since at least 1997. Defendants have pointed to the

27   following judicially noticeable facts which are relevant to the

28

6

court's analysis, particularly the jurisdictional inquiry that decides this motion:

In December 1997, Nehemiah brought suit against HUD to obtain a declaration that its DAP complied with HUD's down payment rules and that mortgages using its DAP were eligible for FHA insurance. See Nehemiah Progressive Hous. Dev. Corp. v. Coumo, No. 97-2311 (E.D. Cal.); (Brown Decl. Exs. 9 to 16.). Nehemiah complained that after initially granting Nehemiah conditional approval, HUD then indicated that the program was not compliant with HUD regulations. (See Brown Decl. Ex. 9 ¶¶ 20-33.) HUD and Nehemiah settled the suit on April 6, 1998. The settlement stated:

> HUD has determined that plaintiff's down payment assistance program ("DAP") is not in conflict with HUD's regulations and administrative requirements. Plaintiff may operate that DAP throughout the United States, in accordance with the approval set forth herein and with HUD's existing regulations, handbook, mortgage letters and other governing documents...

(Id. Ex. 17 at 1-2.)

However, HUD was apparently internally conflicted about the DAPs. On September 14, 1999, HUD published for public comment a proposed regulation that would have changed the down payment requirements for FHA loans so as to prohibit the use of DAPs. See 64 Fed. Reg. 49956 (Sept. 14, 1999). HUD explained in proposing the regulation that DAPs caused concern in part because when a borrower uses a DAP, "the sales price is often increased so that the seller's net proceeds are not diminished," which results in increased risk to the FHA through potentially higher rates of default on insured loans. Id.

On March 31, 2000, HUD's Office of the Inspector General ("HUD OIG") issued a public audit on DAPs. It found that:

7

> The programs do not meet the intent of FHA requirements in that the assistance is not a true gift to the home buyer, and because the nonprofit is reimbursed for the assistance by the seller or builder. ... In addition, some sellers increased the house prices to cover fees paid to the nonprofit organizations, which results in higher loan amounts and less equity for the home buyer, and increases the risk to the FHA insurance fund.

(Brown Decl. Ex. 18 at 7.) HUG OIG nevertheless acknowledged that HUD had allowed the programs to operate and recommended that HUD implement the then-still-pending proposed regulation. (Id. at 29, 36.)

In 2001, notwithstanding HUD OIG's recommendation, HUD withdrew the proposed regulation after comments leaned decidedly against the rule's adoption. See 66 Fed. Reg. 2851 (Jan. 12, 2001) (noting that only 21 of 1,871 comments favored the rule).

On September 25, 2002, HUD OIG issued a second audit report concerning the DAPs. (Brown Dec. Ex. 19.) The report noted a high default rate among DAP assisted loans and reiterated its advice that HUD adopt a rule largely prohibiting the use of DAPs. (Id. at 8-10.)

In November 2005, the Government Accountability Office ("GAO") issued a report evaluating DAPs. (Brown Dec. Ex. 25.) The report noted:

> [P]roperty sellers often raised the sales price of their properties in order to recover the contribution to the seller-funded nonprofit that provided the down payment assistance. In these cases, homebuyers may have mortgages that were higher than the true market value price of the house and would have acquired no equity through the transaction.

(Id. at 19-20.) The GAO also noted that "[m]arketing materials from seller-funded nonprofits often emphasize that property sellers

using these down payment assistance programs earn a higher net profit than property sellers who do not." (Id. at 14.)

In May 2007, HUD proposed, for the second time, a regulation that would have prevented the use of DAPs in FHA-insured mortgages. See 72 Fed. Reg. 27048 (May 11, 2007). In explaining the need for the regulation, HUD stated that its "primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA." Id.

Despite opposition from members of Congress, HUD adopted the proposed regulation in October 2007. See 72 Fed. Reg. 56002 (Oct. 1, 2007). However, within several months, two district courts enjoined HUD from enforcing it. See Penobscot Indian Nation v. HUD, 539 F. Supp. 2d 40, 47 (D.D.C. 2008); Nehemiah Corp. of Am. v. Jackson, 546 F. Supp. 2d 830, 848-49 (E.D. Cal. 2008); see also 73 Fed. Reg. 80297 (Dec. 19, 2008) (formally vacating the enjoined regulation).

On July 30, 2009, Congress enacted the Housing and Economic Recovery Act ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654. Section 2113 of HERA effectively barred DAPs by prohibiting a seller from reimbursing "directly or indirectly" any third party contributing to a borrower's down payment. 12 U.S.C. 1709(b)(9)(C). This restriction applies to mortgages for which the mortgagee has issued credit approval for the borrower on or after October 1, 2008. Id.

///

///

///

## C.   Procedural History

This is the second FCA claim Plaintiff has filed in relation to mortgages originated with DAP gifts. In an action initiated on June 15, 2007, Plaintiff filed three complaints against 12 mortgage lenders (including some of the defendants in the present case) with allegations similar to those in the instant action. See United States ex rel. Hastings v. Countrywide Home Loans, Inc., No. 07-3897-JFW-PLA (C.D. Cal.) (Dkt. Nos. 1, 6, 23) ("2007 Action"). As in the present case, the 2007 Action alleged that the lenders submitted false claims to the government on loans where the borrower's down payments came from DAPs. As here, Plaintiff alleged that the defendants had falsely certified that the loans were compliant with the requirement that the borrower provide a 3 percent cash down payment as then required by 12 U.S.C. § 1709(b)(9) and HUD Handbook 4155.1's prohibition on down payment assistance gifts where repayment of the gift is expected or implied. (See 2007 Action, SAC ¶¶ 25, 27, 32, 35.) However, whereas the instant case alleges an implied requirement that borrowers repay the gift through a higher sales price, the earlier case focused only on the seller who was allegedly contractually obligated to reimburse the charity for the gift. (See id. ¶ 32.) After the government declined to intervene, Plaintiff voluntarily dismissed the action without prejudice under Federal Rule of Civil Procedure Rule 41(a)(1)(A)(i) in June 2009. (Id. Dkt. No. 47.)

## II.   Legal Standard

Defendants moved to dismiss Plaintiff's FAC under both Federal Rule of Civil Procedure 12(b)(1) (lack of subject matter

1  jurisdiction) and Rule 12(b)(6) (failure to state a claim upon
2  which relief may be granted).

3  **A.  Rule 12(b)(1)**

4      A Rule 12(b)(1) dismissal is appropriate when the amended
5  complaint or extrinsic evidence fails to establish the court's
6  subject matter jurisdiction over the action. Roberts v. Corrothers,
7  812 F.2d 1173, 1177 (9th Cir. 1987). A plaintiff always bears the
8  burden of establishing subject matter jurisdiction, and the court
9  presumes a lack of jurisdiction until Plaintiff proves otherwise.
10  Stock W. Inc. v. Confederated Tribes of the Colville Reservation,
11  873 F.2d 1221, 1225 (9th Cir. 1989).

12      A Rule 12(b)(1) motion may challenge a complaint's allegations
13  on their face or by pointing to evidence outside of the complaint.
14  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir.
15  2004); Thornhill Publ'g Co., Inc. v. General Tel. & Elec. Corp.,
16  594 F.2d 730, 733 (9th Cir. 1979). In a factual challenge, once the
17  moving party has presented evidence tending to show a lack of
18  subject matter jurisdiction, the burden shifts to "the party
19  opposing the motion [to] furnish affidavits or other evidence
20  necessary to satisfy its burden of establishing subject matter
21  jurisdiction." Safe Air, 373 F.3d at 1309 (citations omitted). If
22  Plaintiff cannot establish the jurisdiction it seeks to invoke, the
23  court must dismiss the case under Rule 12(b)(1).

24  **B.  Rule 12(b)(6)**

25      A complaint will survive a motion to dismiss under Rule
26  12(b)(6) when it contains "sufficient factual matter, accepted as
27  true, to state a claim to relief that is plausible on its face."
28  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted.  Id. at 678 (citations and internal quotation marks omitted).

**III. Discussion**

**A.   The False Claims Act's Jurisdictional Bar**

Federal courts have no power to consider claims for which they lack subject matter jurisdiction. Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986). Accordingly, before considering Defendants' argument that Plaintiff has failed to state a claim upon which relief may be granted, the court must first consider Defendants' contention that the court lacks subject matter jurisdiction over Plaintiff's claims.

The False Claims Act deprives a district court of jurisdiction over any *qui tam* action that is based upon allegations or transactions already disclosed in certain public fora, unless the

12

relator is the original source of the information underlying the action. Specifically, 31 U.S.C. § 3730(e)(4)(A) states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

In analyzing whether a claim is barred under this provision, a court must conduct a two-tiered inquiry. First, the court must determine whether there has been a prior "public disclosure" of the "allegations or transactions" upon which the *qui tam* suit is based. A-1 Ambulance Serv., Inc. v. California, 202 F.3d 1238, 1243 (9th Cir. 2000). Second, if there has been a qualifying public disclosure, the court must inquire whether the relator is the "original source of the information" contained in the disclosure. Id. The *qui tam* relator bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. See United States v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1018 (9th Cir. 1999).

1.   **Public Disclosure**

"The 'public disclosure' standard is met if there were either (1) public allegations of fraud 'substantially similar' to the one described in the FCA complaint, or (2) enough information publicly disclosed regarding fraudulent transactions so that the government is on notice to either investigate further or to make a decision to proceed with its own claim. It is not necessary for the public

13

disclosures to have specifically named a defendant, to have

provided explanatory details, or to have alleged overcharging,

false-invoicing, false certification, or any other specific fraud."

Amphastar Pharm. Inc. v. Aventis Pharma SA, 2012 WL 5512466 at *6

(C.D. Cal. Nov. 14, 2012) (citing Alcan Elec., 197 F.3d at 1018

(9th Cir. 1999)); see also A-1 Ambulance, 202 F.3d at 1245.

　　　　Defendants contend that this court lacks jurisdiction of the

instant claims because numerous public disclosures discussing the

DAPs and the increases to sales prices associated with them

occurred prior to the filing of the instant complaint. (Motion at

17.) Indeed, as discussed above, Defendants point to numerous

public documents long before this action was filed in 2012

discussing the DAPs and their legal status under the National

Housing Act and HUD/FHA rules, including discussion of the practice

of sellers passing on the cost of financing DAP "gifts" through

higher sales prices.

　　　　For example, as to disclosures from administrative agencies,

as noted above, HUD OIG's March 2000 report found that "some

sellers have raised the sales prices of properties to cover the

cost of the down payment assistance programs causing buyers to

finance higher loan amounts." (Brown Decl. Ex. 18 at 1 ("HUD OIG

Report").) Likewise, as noted above, the Government Accounting

Office's 2005 report on DAPs found that homes with seller-funded

assistance tend to have higher sales prices. (Id. Ex. 25 at 19-20.)

Defendants point to similar public references to increased sales

prices associated with DAPs made in (i) other federal reports (see

id. Exs. 23 at 16; 24 at 36; 25 at 19-20); (ii) at Congressional

hearings (see id. Exs. 22 at 33; 27 at 12-13, 14, 28, 29; 29);

14

1    (iii) in Federal Register notices such as 72 Fed. Reg. 27048 (May

2    11, 2007) and 72 Fed. Reg. 56002 (Oct. 1, 2007); and (iv) in

3    judicial opinions, see Penobscot Indian Nation v. HUD, 539 F. Supp.

4    2d 40, 44-45 (D.D.C. 2008); Nehemiah Corp. of Am. v. Jackson, 546

5    F. Supp. 2d 830, 841 (E.D. Cal. 2008).

6         Defendants also point to articles in the news media. At least

7    one of the articles cited by Defendants squarely considered the

8    impact of DAPs on sales prices at a stage early in the development

9    of DAPs. A February 27, 1999 article in the Washington Post stated,

10            The Nehemiah program works only with the cooperation of
              sellers, who pay a 4 percent fee to the nonprofit group. The
11            fee covers administrative costs and a 3 percent gift to the
              buyer that the buyer uses for a down payment. Like other
12            seller-assisted sales, the costs are usually shifted to the
              buyer via an increased price on the house.

13

14   (Brown Decl. Ex. 8 at 2.)

15        Plaintiff contends that these disclosures were not sufficient

16   under 31 U.S.C. § 3730(e)(4)(A) on several grounds, each of which

17   the court finds unconvincing. First, Plaintiff contends that the

18   public disclosures are insufficient because they do not refer to

19   the DAPs as "fraudulent" or mention the "sales price manipulation

20   scheme." (Opposition at 36-37.) However, such explicit reference to

21   fraud is not required for a disclosure to qualify under the

22   statute. Rather, as noted above, all that is required is that the

23   disclosures "contain[] enough information to enable the government

24   to pursue an investigation." Alcan Elec., 197 F.3d at 1019. As

25   discussed above, documents from HUD, GAO, the press, and

26   congressional hearings specifically considered DAPs in reference to

27   their impact on sale prices well before this action was filed.

28   These disclosures gave the government adequate notice to pursue

1    potential FCA claims against Defendants under the theory advanced

2    by Plaintiff in this action.

3         Second, Plaintiff contends that the prior disclosures are not

4    sufficient because they did not accuse any particular Defendant in

5    the present case of engaging in the alleged fraud. (Opp. at 38.)

6    This argument fails because, as noted above, it is "not necessary

7    for the public disclosures to have specifically named a defendant,"

8    so long as the disclosures provided the government with sufficient

9    notice of the alleged wrongdoing to enable it to investigate.

10   Amphastar, 2012 WL 5512466 at *6. The disclosures did so here.

11   Plaintiff contends that there are too many FHA lenders in the

12   marketplace for the earlier disclosures to have enabled the

13   government to investigate the conduct of Defendants in the instant

14   action. (Opp. at 37-38.) However, Plaintiff concedes in his FAC

15   that Defendants "dominate the FHA lending marketplace with the

16   majority market share." (FAC ¶ 270.) Defendants thus would have

17   been obvious targets of investigations of potential claims had the

18   government been inclined to pursue such investigations. (See Reply

19   at 5-6.)

20        Third, Plaintiff contends that the government reports,

21   inquiries, and actions cited by Defendants are insufficient because

22   they were motivated by and focused on high default rates, rather

23   than "sales price manipulation." (Opp. at 37.) However, the focus

24   of a document containing a disclosure is not relevant, so long as

25   the disclosure contains sufficient information to enable the

26   government to investigate the alleged fraud, which was plainly the

27   case here. See Amphastar, 2012 WL 5512466 at *6.

28

1   In short, the contention that DAPs resulted in higher prices
2   for consumers was part of a robust public debate well before
3   Plaintiff's FAC was filed. These disclosures were sufficient to put
4   the government on notice of the conduct of Defendants that
5   Plaintiff alleges violated HUD regulations under his inflated sales
6   price theory.
7   **2.   Original Source**
8       Once the court finds that the allegations underlying the fraud
9   have been publicly disclosed, it only has subject matter
10  jurisdiction over the claim if the relator is an "original source
11  of the information." 31 U.S.C. § 3730(e)(4)(A). To be considered an
12  original source, the relator must show that "(1) he has direct and
13  independent knowledge of the information on which his allegation is
14  based; (2) he has voluntarily provided the information to the
15  Government before filing his *qui tam* action; and (3) he had a hand
16  in the public disclosure of allegations that are a part of the
17  suit." <u>Meyer</u>, 565 F.3d at 1201 (quoting <u>United States v. Hughes
18  Aircraft Co.</u>, 162 F.3d 1027, 1033 (9th Cir. 1998)).
19      A relator has "direct and independent knowledge" for purposes
20  of § 3730(e)(4) where he "discovered the information underlying his
21  allegations of wrongdoing through his own labor." <u>United States ex
22  rel. Devlin v. State of Cal.</u>, 84 F.3d 358, 360 (9th Cir. 1996)
23  (footnote omitted). The relator must have "firsthand" knowledge of
24  the alleged fraud. <u>Id.</u>
25      In <u>Wang ex rel. United States v. FMC Corp.</u>, the Ninth Circuit
26  held that an engineer-relator who had been called in to study a
27  problem with a product had "direct and independent" knowledge of
28  the problem because "he saw [it] with his own eyes" and his

17

knowledge was "unmediated by anything but [his] own labor." 975 F.2d 1412, 1417 (9th Cir. 1992). Similarly, the court held in United States ex rel. Barajas v. Northrop Corp. that an employee of a government subcontractor who brought a *qui tam* action alleging falsified testing had "direct and independent knowledge" of the allegations because "he acquired [his knowledge] during the course of his employment [by the subcontractor]." 5 F.3d 407, 411 (9th Cir. 1993), cert. denied, 511 U.S. 1033 (1994).

By contrast, in Devlin, in the case of a *qui tam* action brought by individuals who were informed by a state Department of Social Services employee that the department had defrauded the United States government by inflating client statistics to qualify for increased federal funding, the court held that "the relators' knowledge was not direct and independent because they did not discover firsthand the information underlying their allegations of fraud." 84 F.3d at 361. The court explained that relators "did not see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else, but derived it secondhand from [an employee of the alleged department-perpetrator of fraud], who had firsthand knowledge of the alleged fraud as a result of his employment at [the department]." Id. The relator had supplemented the information he obtained from the insider by confirming with the parties for whom the perpetrator had purportedly done work that the work was not in fact performed. Id. But the court explained the relator "did not make a genuinely valuable contribution to the exposure of the alleged fraud" because "federal investigators would have done precisely the same thing

18

1   once the information provided by [the insider] had been made

2   public." Id.

3        In the instant case, Plaintiff's contention that he is an

4   original source is unsuccessful. With respect to the FAC, the facts

5   alleged fall well short of establishing original source status

6   because, among other things, the allegations lack dates (or even

7   rough time periods) for any alleged communications with the

8   government regarding allegations of fraud.[2] (See FAC ¶¶ 76-79.)

9   Plaintiff has alleged more specific facts in his Opposition and has

10  submitted with the Opposition various unauthenticated exhibits. As

11  Defendants point out, neither assertions made in motions nor

12  unauthenticated exhibits are admissible factual evidence under

13  Local Rule 7-6 and Federal Rule of Evidence 901. Moreover, even if

14  Plaintiff's contentions were offered in the form of admissible

15  evidence, they would not suffice to establish that Plaintiff is an

16  original source.

17       Plaintiff asserts that he learned of the Nehemiah program

18  operating in the resale home market on March 6, 1997 when he

19  received marketing materials from Nehemiah regarding the program,

20  which were apparently faxed throughout the Sacramento Realtor Board

21  _____

22       [2] Plaintiff alleges in the FAC that he criticized Nehemiah-
     like programs in a patent application he filed on April 20, 1999.
23  (Id. ¶ 77-78.) However, in opposing Defendants' Joint Motion to
     Dismiss, Plaintiff appears to abandon this basis for establishing
24  his original source status. In any case, a patent application
     submitted to the Patent and Trademark Office, which has no
25  authority the FHA loan program, does not constitute an adequate
     disclosure to the government in this case. See United States v.
26  Bank of Farmington, 166 F.3d 853, 866 (7th Cir. 1999) (explaining
     that notice to the "United States Attorney, the FBI, or other
27  suitable law enforcement office of the information which is the
     basis for the action, or by informing the agency or official
28  responsible for the particular claim in question" would constitute
     adequate disclosure).

1   Area. (Opp. at 29-30, 31) Plaintiff then sent a letter to HUD on

2   March 10, 1997 in which he outlined his criticisms of the program

3   and enclosed the marketing materials. (Id.; Opp. Ex. 7.) He

4   contends that this establishes him as the original source of the

5   information on which his allegations are based. (Opp. at 31.)

6       Plaintiff's contentions fail for multiple reasons. First,

7   Plaintiff did not "discover firsthand the information underlying

8   [his] allegations of fraud." Devlin, 84 F.3d at 361. The only

9   factual information Plaintiff purports to have "discovered" was the

10  overall structure of the Nehemiah program as described by Nehemiah

11  itself in marketing materials it apparently sent to Plaintiff's

12  office (as well as numerous other realtors in the area), which

13  Plaintiff purportedly then forwarded to HUD. Even if the

14  information included sufficiently detailed information to

15  constitute alleged acts of fraud, Plaintiff's knowledge of the

16  Nehemiah program was secondhand and therefore not "direct." See

17  Devlin, 84 F.3d at 362; U.S. ex rel. Casady v. Am. Int'l Grp.,

18  Inc., 2013 WL 1702777 (S.D. Cal. Apr. 19, 2013) (relator may not

19  rely on information from third-party insider from the mortgage

20  industry to qualify as an original source of information); United

21  States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703

22  (8th Cir. 1995) ("[A] person who obtains secondhand information

23  from an individual who has direct knowledge of the alleged fraud

24  does not himself possess direct knowledge and therefore is not an

25  original source under the [FCA].").

26      Second, it appears likely from Plaintiff's own exhibits that

27  the government was already well aware of the information Plaintiff

28  related to it. Plaintiff points to an email he purportedly sent to

20

1  HUD on March 20, 1997 alleging that seller funded DAPs resulting in

2  increased total transactions costs would violate HUD regulations.

3  (Opp. Ex. 8.) However, that letter refers to an earlier (undated)

4  letter sent by HUD to Nehemiah, which indicates that HUD had

5  previously been in communication with Nehemiah regarding the

6  contours of its DAP and expresses HUD's concerns regarding the

7  program's compliance with HUD rules. (See id. Ex. 5 (Letter from

8  HUD official to Nehemiah president commenting on "recent revisions"

9  to the program).) As HUD was apparently already closely monitoring

10  the Nehemiah program, Plaintiff seems to have related to the

11  government little if any factual information of which it was not

12  already aware or would have inevitably have learned. Plaintiff's

13  relaying of the information thus could not have made "a genuinely

14  valuable contribution to the exposure of the alleged fraud."

15  Devlin, 84 F.3d at 361.

16      The fact that, in addition to forwarding to HUD Nehemiah's

17  solicitation materials, Plaintiff also offered his view to HUD that

18  Nehemiah program violated HUD standards does not alter this

19  conclusion. (See Opp. at 42.) Identifying the legal consequences of

20  information already in the public domain does not constitute

21  discovery of fraud. See In re Natural Gas Royalties, 562 F.3d 1032,

22  1045 (10th Cir. 2009) ("A relator's ability to recognize the legal

23  consequences of a publicly disclosed fraudulent transaction does

24  not alter the fact that the material elements of the violation

25  already have been publicly disclosed."); United States v. Alcan

26  Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir. 1999) (holding

27  that relator did not have "direct" knowledge because "his

28  investigation merely added a legal name to describe the alleged

circle of facts"); <u>United States ex rel. Kreindler & Kreindler v. United Technologies Corp.</u>, 985 F.2d 1148, 1159 (2d Cir. 1993) (neither "collateral research and investigations" nor "background knowledge that enabled him to understand the significance of the information acquired" were sufficient to establish relator's direct and independent knowledge of the allegedly fraudulent claims), <i>cert. denied</i>, 508 U.S. 973 (1993); <u>Wang</u>, 975 F.2d at 1418 ("[W]here the public knows of information proving an allegation, it necessarily knows of the allegation itself."); <u>Wood ex rel. U.S. v. Applied Research Assocs. Inc.</u>, 2008 WL 2566728 at *3 (S.D.N.Y. 2008) ("[A relator's] personal hypothesis about what should be concluded from publicly disclosed information does not qualify [the relator] as an original source of information in order to sustain an individual FCA claim on behalf of the government").[3]

     Third, Plaintiff's observations to HUD in 1997 about the likely consequences of the Nehemiah program does not constitute direct and independent knowledge because it was excessively speculative. Plaintiff's communications to HUD in 1997 only described the Nehemiah program in general and the possibility that the program would result in fraudulent claims; they did not include any factual allegations of fraudulent claims. (<u>See</u> Opp. Exs. 5, 8, 11.) Indeed, as the Nehemiah program was apparently in its infancy in 1997, Plaintiff likely could not have had knowledge of any actual false claims to the government until years later. (<u>See</u> FAC

---

[3] As Defendants note, Hastings heavy reliance on <u>U.S. ex rel. Fine v. Chevron, USA, Inc.</u>, 39 F.3d 957 (9th Cir. 1994) is misplaced because that opinion was vacated after the Ninth Circuit, sitting <i>en banc</i>, held that the relator was not an original source. <u>See U.S. ex rel. Fine v. Chevron, U.S.A., Inc.</u>, 72 F.3d 740, 742 (9th Cir. 1995).

1  App'x A (listing mortgages originated in 2007 and 2008).)

2  "[B]ecause the purpose of the FCA is to encourage individuals with

3  true 'knowledge' of alleged wrongdoing to come forward and provide

4  such information to the Government, the purposes of the Act would

5  not be served by allowing a relator to maintain a *qui tam* suit

6  based on pure speculation or conjecture." <u>United States ex rel.</u>

7  <u>Aflatooni v. Kitsap Physicians Servs.</u>, 163 F.3d 516, 525–26 (9th

8  Cir. 1998).

9      Finally, to the extent that Plaintiff asserts that his

10  original source status derives from his submission of documents to

11  the government shortly before filing his Complaint in the instant

12  action (<u>see</u> Opp. at 41), this argument too is unsuccessful. Among

13  other exhibits, the FAC included records Plaintiff asserts he

14  obtained from a Multiple Listing Service, to which he had access as

15  a real estate agent in the employ of a real estate broker. (<u>Id.</u>) As

16  noted above, these records include a set of real estate postings

17  from August 1999 with comments marked "confidential," apparently

18  from brokers, appearing to indicate that a higher sales price would

19  apply in the case of funding from Nehemiah or a Nehemiah-like

20  program. (<u>See</u> FAC Ex. U). Plaintiff has also submitted as

21  appendices to his FAC lists of mortgages issued by Defendants that

22  were originated with Nehemiah assistance that have open liabilities

23  or foreclosure conveyance claims originated in 2007 and 2008,

24  apparently also obtained from the Multiple Listing Service

25  (although the origin is not specified). (<u>See</u> FAC Apps. A–C.)

26  Additionally, Plaintiff submitted corporate underwriting guidelines

27  issued by the Defendants which he contends demonstrate that

28  Defendants had knowledge that the gifts provided in DAPs were

1   false. (See FAC Exs. K1-K9.) Plaintiff asserts that he disclosed
2   some or all of the materials included with his FAC in a
3   communication delivered to office of HUD Inspector General David
4   Montoya on March 1, 2012; he filed his Complaint in the instant
5   action on April 26, 2012. (See Opp. Ex. 10; Dkt. No. 1.)

6        There are at least two reasons why these records do not
7   suffice to establish Plaintiff's original source status. First,
8   Plaintiff's knowledge obtained from sources such as a Multiple
9   Listing Service or like databases that are accessible to the public
10  or large numbers of real estate agents cannot be described as
11  firsthand. To hold otherwise "would mean that anyone – an insider
12  or an outsider – who conducts an investigation and learns of
13  alleged fraud from whatever sources [could] maintain a *qui tam*
14  action." <u>U.S. ex rel. Hansen v. Cargill, Inc</u>., 107 F. Supp. 2d
15  1172, 1185 (N.D. Cal. 2000), <u>aff'd</u>, 26 F. App'x 736, 737 (9th Cir.
16  2002). Second, the various reports cited by Defendants documenting
17  government concern regarding increased sales prices associated with
18  Nehemiah and Nehemiah-like DAPs, starting with the HUD OIG's March
19  31, 2000 report, (Brown Decl. Ex. at 7), demonstrate that the
20  government had sufficient information to investigate the claims
21  asserted here long before Plaintiff submitted the materials
22  included in his FAC to HUD in March 2012.

23       For these reasons, the court finds that Plaintiff has not
24  demonstrated that he is an "original source" of the many qualifying
25  public disclosures that preceded his filing of the instant action.
26  Accordingly, the court must dismiss this *qui tam* action for lack of
27  subject matter jurisdiction.

28

1    The court does not reach and states no opinion with respect to
2    Defendant's additional arguments in support of their Joint Motion
3    to Dismiss.

4

5    **IV.   Conclusion**

6        For the reasons stated herein, Defendant's Motion is GRANTED
7    and the claim is dismissed for lack of subject matter jurisdiction.
8    Because amendment would be futile, the First Amended Complaint is
9    dismissed with prejudice.  In addition, the Motion to Dismiss
10   (**DOCKET NUMBER 70**) is vacated as moot.

11

12   IT IS SO ORDERED.

13

14   Dated: July 15, 2014

                                        DEAN D. PREGERSON

15                                      United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28